## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Raymond Welby, : 
     Petitioner : 
        : 
   v. : No. 1702 C.D. 2014
        : Submitted: June 12, 2015
State Civil Service Commission : 
(PA DOC - SCI Frackville), : 
     Respondent : 

BEFORE: HONORABLE RENÉE COHN JUBELIRER, Judge
     HONORABLE ROBERT SIMPSON, Judge
     HONORABLE ANNE E. COVEY, Judge

OPINION NOT REPORTED

**MEMORANDUM OPINION**
**BY JUDGE SIMPSON**     **FILED: August 27, 2015**

Raymond Welby (Welby), representing himself, petitions for review of an order of the State Civil Service Commission (Commission) sustaining his removal for just cause by the Pennsylvania Department of Corrections (DOC), State Correctional Institution at Frackville (SCI-Frackville or Appointing Authority). Welby contends the Commission erred and abused its discretion in finding just cause to remove him from his employment. To that end, Welby asserts the Commission's necessary findings were not supported by substantial evidence and thus the Commission abused its discretion in finding Appointing Authority met its burden of proving Welby engaged in unprofessional conduct and workplace violence. For the reasons that follow, we affirm.

## I. Background

Welby worked for Appointing Authority as a registered nurse. At the time of Welby's hire in September 2011, Appointing Authority provided him with a copy of DOC's Code of Ethics (Ethics Code). In addition, Welby signed a receipt stating he received, read and agreed to abide by the Ethics Code.

Appointing Authority also provided Welby with a copy of DOC's Workplace Violence Policy, which Welby reviewed during an orientation class session.

In late August 2013, while on vacation away from Employer's premises, Welby telephoned Employer's intelligence-gathering captain, Timothy Clark (Investigator), while on duty. Investigator's duties included investigations of inmate and employee misconduct at SCI-Frackville. Investigator also participated in security threat monitoring, telephone monitoring and mail monitoring.

Welby told Investigator he needed advice in dealing with his immediate supervisor, Mary Alice Kuras (Nurse Supervisor). Welby claimed he heard from a coworker that Nurse Supervisor was spreading disparaging rumors about him to others in the workplace, including his coworkers.[1] In particular,

---

[1] Welby claims in his petition for review to this Court that multiple coworkers informed him that Nurse Supervisor told them Welby received prior discipline with a previous employer for paying a mentally ill patient at a state hospital to masturbate and ejaculate on food that Welby then fed to his fellow coworkers. See Pet. for Review at ¶6(d); Reproduced Record (R.R.) at 318a. Welby asserts Nursing Supervisor's statements were in no way true and constituted sexual harassment. Id. If this disgusting situation actually occurred, Welby continued, he would have lost his license to practice nursing and faced criminal charges. Id.

Welby told Investigator "he was so mad with [Nurse Supervisor] that he wanted to punch her in the face." Notes of Testimony (N.T.), 2/26/14, at 69; Reproduced Record (R.R.) at 69a.

Upon hearing Welby's statement about punching Nurse Supervisor, Investigator told Welby "you can't make statements, you can't make comments like that …. Don't make threats like that, don't tell me this." N.T. at 69; R.R. at 69a. Welby responded "oh, okay, let's just forget I said it." Id.

However, Investigator then asked Welby what his concerns were as to Nurse Supervisor. Welby explained that before he left on vacation approximately two weeks earlier, a fellow nurse told him that Nurse Supervisor was spreading disparaging rumors about prior discipline Welby received while working for another state agency. Investigator responded that he was aware of the rumors, but he did not think Nurse Supervisor would spread these stories to her subordinates. He also believed Nurse Supervisor would not have access to such information. Nonetheless, Investigator asked Welby what he would like to do. Welby responded: "I would like to beat the hell out of her." N.T. at 71; R.R. at 71a. At that point, Investigator told Welby:

> I asked you not to make these threats. These threats are concerning me. You could have said, I want you to investigate it, I would like you to look into this for me. However, you made another threat of violence and I cannot tolerate that. So I'm going to have to report this to my supervisor.

Id.

3

Investigator then asked Welby when he planned to return to work. Welby replied next Thursday. Id. Investigator told Welby not to come to the workplace, but to wait for directions from Appointing Authority's Human Resources Office. N.T. at 72; R.R. at 72a. Investigator then documented his phone conversation with Welby and discussed the call with his supervisor, Deputy Superintendent for Facilities Management, George Miller (Deputy Superintendent). N.T. at 73-74.; R.R. at 73a-74a.

On his first scheduled day back, Welby reported to SCI-Frackville's Superintendent Brenda L. Tritt's office. Following Welby's statement of his version of his telephone conversation with Investigator, Superintendent Tritt removed Welby from the workplace pending further investigation.

Thereafter, Appointing Authority assigned Lieutenant Robert Reese and Lieutenant Todd Johnson to investigate Welby's alleged threats against Nurse Supervisor during the August 2013 phone conversation with Investigator. Lieutenant Reese, the lead investigator, conducted an off-premises interview of Welby regarding that phone conversation.

During the interview, Welby admitted making the phone call to Investigator and making the statement that he would like to punch Nurse Supervisor in the face. N.T. at 106; R.R. at 106a. However, Welby added that he knew he could not punch Nurse Supervisor. Id. Welby also admitted saying that he would like to beat the hell out of Nurse Supervisor, or words to that effect. N.T.

at 107; R.R. at 107a.  Welby also told Lieutenant Reese that he was in a very emotional state during the phone conversation with Investigator.  Id.

Lieutenant Reese also asked Welby to complete a witness statement. In his written statement, Welby admitted he told Investigator he would like to punch Nurse Supervisor in the face, but that he knew he could not.  See Employee Witness Statement at 2;[2]  R.R. at 262a-64a. Welby also admitted in writing that he informed Investigator a second time that he would like to hit or punch Nurse Supervisor, but again indicated he knew he could not do that.  Id.

Welby further indicated: "I didn't mean any actual intent of doing anything like mentioned and was actually asking for advice more than anything … [I] would have no problem continuing to work alongside her if I was told that would be the best thing."  Employee Witness Statement at 3; R.R. at 264a.

Following the investigation, Appointing Authority made a determination to conduct a pre-disciplinary conference (PDC) with Welby. Appointing Authority sent Welby a September 2013 letter notifying him of the PDC and charging him with three violations: Section B(10) of the Ethics Code (employees are expected to treat their supervisors and general public with respect and conduct themselves properly and professionally at all times, unacceptable conduct and insolence will not be tolerated);[3] Section B(2) of the Ethics Code

---

[2] Welby's Employee Witness Statement was introduced into evidence as Exhibit AA-10.

[3] DOC's Code of Ethics was introduced into evidence as Exhibit AA-1.

(excessive force, violence or intimidation will not be tolerated); and, DOC Policy Statement No. 4.1.1 Human Resources and Labor Relations Manual, Section 11 (Workplace Violence Policy).[4] See Ex. AA-8; R.R. at 260a.

At the PDC, Welby pled guilty to violating Section B(10) of the Ethics Code. See PDC Minutes,[5] R.R. at 265a. However, Welby pled not guilty to violating DOC's Workplace Violence Policy. Id.

Further, Welby admitted receiving information about DOC's Workplace Violence Policy and signing for it. R.R. at 266a. He also admitted making the statements that he would like to punch Nurse Supervisor in the face and beat the hell out of her. R.R. at 267a. Human Resource Analyst Anne Plaska (HR Analyst), serving as PDC Panel Chairperson, and Deputy Superintendent, indicated that Welby's statements were a violation of the Workplace Violence Policy. R.R. at 267a-68a. Welby, however, maintained he never intended to harm Nurse Supervisor. Id.

Following the PDC, Appointing Authority terminated Welby by letter on the grounds that he violated Section B(10) of the Ethics Code (unprofessional and unacceptable conduct) and DOC's Workplace Violence Policy, which prohibits threats, by various means of communication, including letter, note, telephone, fax or e-mail. In particular, Appointing Authority noted, Welby's

---

[4] DOC's Workplace Violence Policy was introduced into evidence as Exhibit AA-4.

[5] The Pre-Disciplinary Conference Minutes (R.R. at 265a-70a) were introduced into evidence as Exhibit AA-11.

statements that he wanted to punch Supervisor in the face and beat the hell out of her would not be tolerated. See N.T. Ex. A; Supplemental Reproduced Record (S.R.R.) at 7b-8b.

Welby timely appealed his removal from employment to the State Civil Service Commission (Commission). Thereafter, the Commission granted Welby a hearing under Section 951(a) of the Civil Service Act.[6] In February 2014, the Commission held an evidentiary hearing at which both parties presented evidence. See N.T. at 1-210; R.R. at 1a-210a.

In July 2014, the Commission issued an adjudication and order dismissing Welby's appeal. The Commission determined Appointing Authority presented sufficient evidence to establish just cause for Welby's removal under Section 807 of the Civil Service Act, 71 P.S. §741.807 (no regular employee in the classified service shall be removed except for just cause). In particular, the Commission reasoned (with emphasis added):

> Upon review of the record, the Commission finds that [Appointing Authority] presented sufficient evidence to support the charges. We find [Investigator] credible that [Welby] made more than one remark threatening physical harm to [Nurse Supervisor]. [Welby] acknowledges making the threatening remarks. We reject [Welby's] contention that his response was merely an inappropriate emotional response. [Welby] was off work for fourteen days before calling to speak to [Investigator]. During that time off, his emotions escalated instead of providing distance from the situation.

---

[6] Act of August 5, 1941, P.L. 752, added by the Act of August 27, 1963, P.L. 1257, as amended, 71 P.S. §741.951(a).

7

[Welby] acknowledges that he deliberately made his first statement. Even after [Investigator's] initial admonishment not to make any additional threats, it was mere minutes later that he made a second threat toward [Nurse Supervisor]. We find [Deputy Superintendent] credible that [Welby's] threatening remarks cannot be tolerated in an environment where security is an utmost concern and manipulative inmates could distort any tension between [Welby] and [Nurse Supervisor] to their advantage. [Welby's] deliberate remarks, threatening physical violence toward his supervisor, clearly reflected negatively upon his competency and ability to perform his job duties. [Bazargani v. State Civil Serv. Comm'n, 711 A.2d 529 (Pa. Cmwlth. 1998)].

Comm'n Adj., 7/23/14, at 11-12; R.R. at 310a-12a. Welby filed a petition for review of the Commission's order.[7]

## II. Issues

Welby contends the Commission erred and abused its discretion in determining Appointing Authority established just cause for his removal from employment. In particular, Welby asserts the Commission's necessary findings were not supported by substantial evidence and, therefore, the Commission abused its discretion in finding Appointing Authority met its burden of showing he engaged in unprofessional conduct and workplace violence.

---

[7] Our review involving agency adjudications is limited to a determination of whether the agency's findings are supported by substantial evidence, whether the agency erred as a matter of law or whether it violated constitutional rights. Cutler v. State Civil Serv. Comm'n (Office of Admin.), 924 A.2d 706 (Pa. Cmwlth. 2007).

8

## III. Discussion

In civil service cases, the Commission is the sole fact-finder. Perry v. State Civil Service Comm'n (Dep't of Labor & Indus.), 38 A.3d 942 (Pa. Cmwlth. 2011); Bosnjak v. State Civil Serv. Comm'n, 781 A.2d 1280 (Pa. Cmwlth. 2001). Therefore, issues as to witness credibility and resolution of evidentiary conflicts are within the exclusive province of the Commission, and we will not reweigh the evidence or substitute our judgment even though we might have reached a different conclusion. Thompson v. State Civil Serv. Comm'n, 863 A.2d 180 (Pa. Cmwlth. 2004). In reviewing a Commission decision, we view the evidence, and all reasonable inferences arising from the evidence, in the light most favorable to the prevailing party. Perry.

### A. Just Cause for Removal
### 1. Generally

The ultimate issue before this Court, Welby acknowledges, is whether Appointing Authority had just cause to remove him from employment. Welby claims his alleged threats against Nurse Supervisor were merely careless remarks made out of frustration rather than intentional threats. Welby further claims he had no actual intent to harm Nurse Supervisor, his verbal remarks were not work-related, and they did not constitute egregious misconduct of any sort. Therefore, Welby argues, Appointing Authority did not have just cause to terminate his employment.

Pursuant to Section 807 of the Civil Service Act, a civil service employee may be removed from employment only for just cause. Thompson. The

9

appointing authority has the burden of showing just cause for removal. Id. The term *just cause* is not defined in the Act. Nonetheless, just cause must be merit-related and the criteria for determining just cause must touch upon the employee's competency and ability in some rational and logical manner. Woods v. State Civil Service Comm'n, 912 A.2d 803 (Pa. 2006); Perry; Thompson.

Further, what constitutes just cause for removal is largely a matter of discretion on the part of the head of the department. Id. However, to be sufficient, the cause should be personal to the employee and such as to render him unfit for the position he occupies, thus making dismissal justifiable and for the good of the service. Id. Whether the employee's actions constitute just cause for removal is a question of law fully reviewable on appeal. Perry.

## 2. Violations of Employer's Policies

Here, Appointing Authority dismissed Welby for violations of Section B(10) of the Ethics Code and DOC's Workplace Violence Policy. Section B(10) of DOC's Ethics Code provides (with emphasis added):

> Employees are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

R.R. at 220a. DOC's Workplace Violence Policy pertinently provides (with emphasis added):

> [DOC] is committed to ensuring a safe environment for its employees and is dedicated to maintaining a work environment that is free from violence. [DOC] has a zero tolerance policy for any incidents of workplace violence,

10

including threats of violence, by or against its employees or other individuals on Commonwealth property. All forms of violence, threatening behavior, and … harassment, which involve or affect employees of [DOC] are prohibited by this policy. Violence, threats, harassment, intimidation, and other behaviors that are disruptive to [DOC] will not be tolerated, regardless of mistakes, ignorance, or other extenuating circumstances. All reports of workplace violence incidents will be taken seriously and will be dealt with appropriately through a prompt investigation …. Violations of this policy by [DOC] employees may lead to disciplinary action, up to and including termination, from employment.

Violence connected to the workplace takes many forms. Incidents of workplace violence include, but are not limited to, threats in person, by letter or note, telephone, fax, or electronic mail …. Incidents of workplace violence may occur either at or away from the workplace. The determining factors in assessing whether any incident constitutes workplace violence are the individuals involved and the relationship of the action to the workplace; the location of the incident; and … if the violence is as a result of Commonwealth business.

R.R. at 247a.

### 3. Commission's Critical Findings

At the Commission's February 2014 hearing, both Investigator and Welby testified regarding their August 27, 2013 phone conversation about Nurse Supervisor. Based on their testimony, the Commission made the following findings:

12. [Welby] told [Investigator] that [Nurse Supervisor] was spreading false rumors about him. N.T. pp. 69, 154.

13. [Investigator] asked [Welby], 'What would you like to do?' [Welby] replied that he was so mad 'he wanted

11

to punch [Nurse Supervisor] in the face.' N.T. pp. 69, 15[3].

14. [Investigator] advised [Welby] that if he was seeking advice, he could not continue to make threatening comments or statements. N.T. pp. 69, 153.

15. [Welby] replied, 'Okay, let's just forget I said it. I won't even tell anybody that I called you.' N.T. pp. 69-70.

16. [Investigator] asked [Welby] to explain his concern. [Welby] stated that he had recently learned that [Nurse Supervisor] was talking about his prior disciplinary action to his coworkers. N.T. p. 70.

17. [Investigator] said that he had also heard the rumor, but did not think [Nurse Supervisor] would tell her subordinates stories about [Welby]. [Investigator] said he did not think [Nurse Supervisor] would be privy to the information or spread rumors. N.T. pp. 70-71, 152.

18. [Investigator] then asked what [Welby] would like him [Investigator] to do. [Welby] replied 'I would like to beat the h*ll out of her.' N.T. pp. 71, 153-154.

19. [Investigator] replied: 'I asked you not to make these threats. These threats are concerning me. You could have said, 'I want you to look into this for me.' However, you made another threat of violence and I cannot tolerate that. So I'm going to have to report this to my supervisor. N.T. p. 71.

Comm'n Adj., 7/23/14, Findings of Fact (F.F.) Nos. 12-19; R.R. at 304a-05a.

## 4. Just Cause Determination

Ultimately, the Commission, noting that Welby, by making another threatening remark toward Nurse Supervisor after being warned, violated Section B(10) of DOC's Ethic Code and DOC's Workplace Violence Policy. Comm'n

12

Adj. at 11-12; R.R. at 310a-11a. Deputy Superintendent testified Section B(10) requires that DOC employees treat other employees, their supervisors, and the general public respectfully and professionally. N.T. at 117; R.R. at 117a. Any other behavior will not be tolerated. Id. Welby's threats against Nurse Supervisor were disrespectful and unprofessional. Id.

The Commission also credited Deputy Superintendent's testimony that Welby's threats violated DOC's Workplace Violence Policy. See N.T. at 117-19; R.R. at 117a-19a. Deputy Superintendent testified Welby's threat to punch another employee in the face directly impacted his ability to perform his job. N.T. at 118; R.R. at 118a. If Welby and Nurse Supervisor did get into a confrontation at SCI-Frackville, it would affect the morale of other employees who were expecting Appointing Authority to provide a safe environment. See N.T. at 118-19; R.R. at 118a-19a. To that end, DOC's Workplace Violence Policy has a zero tolerance for any form of workplace violence. N.T. at 119; R.R. at 119a.

In addition, if the inmates were to see such a confrontation, they might learn to use those circumstances for various manipulative purposes in order to obtain contraband or even escape. N.T. at 118-19; R.R. at 118a-19a. Ultimately, the Commission determined Welby's deliberate remarks, which threatened physical violence toward his supervisor, clearly reflected negatively upon his competency and ability to perform his job duties. Comm'n Adj. at 12; R.R. at 311a. Therefore, the Commission concluded, Appointing Authority established just cause for Welby's removal. Id.

### 5. Welby's Argument

On appeal here, Welby argues the Commission erred and abused its discretion in determining Appointing Authority established just cause for his removal based on informal comments he made while on vacation. Essentially, Welby reiterates the same argument that he presented to the Commission. To constitute just cause, an employee's behavior or actions must touch upon his competency or ability in some rational or logical manner. Id. In making his emotional remarks to Investigator on the phone while on vacation, Welby claims he was merely blowing off steam and had no intent of actually harming Nurse Supervisor.

Further, Welby asserts, Appointing Authority presented no evidence that he could not competently perform his duties as a trained nurse. To that end, Welby contends Appointing Authority had no rational or logical reason to terminate him based on a comment made out of frustration while outside the course of his employment. In short, Welby argues Appointing Authority presented no credible evidence that he was a true threat to Nurse Supervisor or that he treated her in a disrespectful manner. Therefore, Welby asserts his remarks to Investigator were essentially non-work-related and did not put anyone at risk.

In support of his position, Welby cites, among other cases, Department of Corrections v. Pennsylvania State Corrections Officers Association, 923 A.2d 1212 (Pa. Cmwlth. 2007), a grievance arbitration case where an arbitrator's award modified a corrections officer's termination to a five-day suspension because the officer's off-duty threats to kill his ex-wife and others,

14

while communicated to a friend who was an on-duty DOC employee, were not directed at DOC or its employees or inmates. On appeal, this Court upheld the arbitrator's modification of the officer's removal from employment to a suspension on the ground that the officer's threats did not have a direct negative effect on DOC's operations.

Here, Welby claims he merely called Investigator for advice and his statements about harming Nurse Supervisor, made while on vacation, had no effect on his competency and ability to perform his job. Therefore, his statements had no direct negative effect on Appointing Authority's operations.

Welby further contends he did not engage in willful misconduct as defined by the courts in unemployment compensation cases. Section 402(e) of the Unemployment Compensation Law[8] states an employee shall be ineligible for compensation for any week in which his unemployment is due to willful misconduct connected to his work.[9] In order to constitute a threat, a communication must convey an intent to inflict harm or loss on another or on another's property. Aversa v. Unemployment Comp. Bd. of Review, 52 A.3d 565 (Pa. Cmwlth. 2012). Here, Welby maintains, his heat of the moment statements

---

[8] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, as amended, 43 P.S. §802(e).

[9] Willful misconduct within Section 402(e) is defined by the courts as: 1) wanton and willful disregard of an employer's interests; 2) deliberate violation of rules; 3) disregard of the standards of behavior which an employer can rightfully expect from an employee; or 4) negligence showing an intentional disregard of the employer's interests or the employee's duties and obligations. Grieb v. Unemployment Comp. Bd. of Review, 827 A.2d 422 (Pa. 2002).

15

about harming Nurse Supervisor, followed by the statement that he knew he could not do that, lack any evidence of an intent to harm.

Welby further asserts Nurse Supervisor, by spreading disparaging and defamatory rumors him, created a continuously hostile work environment which caused him to use a poor choice of words in his conversation with Investigator, which Welby believed to be an informal conversation. However, Welby claims, other than these heat of the moment remarks, there was no evidence to indicate he intended to harm Nurse Supervisor. Further, Welby told Investigator during the phone call he knew he could not physically harm Nurse Supervisor. Relying on J.S. ex rel. H.S. v. Bethlehem Area School District, 807 A.2d 847 (Pa. 2002), Welby thus argues his remarks cannot be considered a *true threat* under the totality of the circumstances in this case.

For these reasons, Welby argues the Commission's determination that he acted unprofessionally or disrespectfully toward Nurse Supervisor and that he violated DOC's Workplace Violence Policy, were not supported by substantial evidence. Therefore, Welby asserts Appointing Authority failed to establish just cause for his removal.

**6. Analysis**

As discussed above, the Commission is the sole fact-finder in civil service cases. Perry. Therefore, determinations as to witness credibility and the resolution of conflicting evidence are within the exclusive province of the Commission. Id. As such, we may not reweigh the evidence or substitute our

16

judgment for that of the Commission, even though we may have reached a different factual conclusion. Id.

Here, the Commission determined Welby violated Section B(10) of the Ethics Code by telephoning Investigator and telling him that he would like to punch Nurse Supervisor in the face. Although Welby asked Investigator if he could call him "off the record" at his home number, Investigator declined Welby's request. See F.F. No. 11; N.T. at 152; R.R. at 152a.

Investigator then advised Welby that if he was seeking advice, Welby could not continue to make threats like that. F.F. No. 14; N.T. at 153; R.R. at 153a. Nonetheless, according to Investigator, when he again asked Welby what he wanted to do about Nurse Supervisor, Welby replied: "I would like to beat the hell out of her." F.F. No. 18; N.T. at 71; R.R. at 71a. Even Welby testified he replied that what he would like to do was to "you know, punch her up, to choke her." N.T. at 153; R.R at 153a.

Given Welby's repeated threats of physical harm toward Nurse Supervisor over the phone to Investigator, we discern no error or abuse of discretion in the Commission's determination that Welby engaged in unprofessional conduct, which was clearly disrespectful of Nurse Supervisor. As such, Welby violated Section B(10) of DOC's Ethics Code, which requires that a DOC employee treat fellow employees, including supervisors, with respect.

17

Similarly, we discern no error or abuse of discretion in the Commission's determination that Welby's threats of physical harm against Nurse Supervisor violated DOC's Workplace Violence Policy. As HR Analyst and Deputy Superintendent explained at the PDC and the Commission hearing, DOC has a zero tolerance policy for workplace violence, which includes threats of violence by one employee against another. Therefore, Welby's statements to Investigator that he would like to punch Nurse Supervisor in the face, and beat and choke the hell out of her, violated DOC's Workplace Violence Policy.

Further, we discern no error or abuse of discretion in the Commission's determination that Welby's violations of DOC's Ethic's Code and Workplace Violence Policy established just cause for his dismissal. As indicated by the Workplace Violence Policy, Appointing Authority has a zero tolerance policy for workplace violence, including threatening behavior, "regardless of mistakes, ignorance, or other extenuating circumstances." R.R. at 247a (emphasis added).

What constitutes just cause is largely a matter of discretion for the head of the department. Woods; Perry. Here, the Commission credited Deputy Superintendent's testimony that Welby's statements that he would like to punch and choke Nurse Supervisor directly impacted his ability to perform his job. N.T. at 118; R.R. at 118a. If Welby and Nurse Supervisor did get into a confrontation at SCI-Frackville, it could affect the morale of other employees who were expecting Appointing Authority to provide a safe environment. N.T. at 118-19; R.R. at 118a-19a.

18

In addition, if the inmates were to see such a confrontation, they might learn to use those circumstances for various manipulative purposes. N.T. at 118-19; R.R. at 118a-19a. Therefore, we agree with the Commission that Welby's deliberate remarks, which threatened physical violence toward his supervisor, clearly reflect negatively upon his competency and ability to perform his job duties. See Comm'n Adj. at 12; R.R. at 311a.

Further, as the Commission aptly noted, Welby's anger toward Nurse Supervisor appeared to escalate rather than dissipate during the time spent on vacation. Comm'n Adj. at 12; R.R. at 311a. As HR Analyst recognized at the PDC, Welby made the statements about punching Nurse Supervisor because he was angry and upset, not because he was joking. R.R. at 267a. Regardless, HR Analyst viewed these statements as a clear violation of the Workplace Violence Policy. Id. As discussed above, threats of violence cannot be justified by extenuating circumstances such as Welby's animosity toward Nurse Supervisor based on his belief that she spread disparaging rumors about him.

Consequently, we find that substantial evidence supports the Commission's determinations that Welby violated Section B(10) of DOC's Ethics Code and DOC's Workplace Violence Policy. We further conclude the Commission did not err or abuse its discretion in holding Welby's statements that he would like to physically assault Nurse Supervisor, constituted just cause for his dismissal from employment.

We also dismiss as irrelevant Welby's contention that he did not engage in willful misconduct as defined by the courts in unemployment compensation cases. Just cause for the removal of a civil service employee is a different standard from that of willful misconduct in unemployment compensation cases. See Perry; Morrison v. Dep't of Corr., 659 A.2d 620 (Pa. Cmwlth. 1995). Thus, even assuming the Unemployment Compensation Board of Review determined Welby's violations of DOC's policies did not rise to the level of willful misconduct, this would not preclude the Commission from determining just cause existed for Welby's removal from civil service. Morrison.

Similarly, Welby's citations to cases reviewing just cause analyses in grievance arbitration awards are also misplaced. Although accompanied by a union representative at the PDC, Welby did not indicate he filed a labor grievance challenging his removal from employment under the parties' collective bargaining agreement (CBA). Regardless, this appeal is limited in scope to a review of the Commission's adjudication and order determining that Appointing Authority established just cause for his removal under Section 807 of the Civil Service Act. Consequently, our decision in Pennsylvania State Corrections Officers Association, which determined that an arbitrator's decision that DOC did not have just cause under the CBA to terminate an officer, based on his off-duty threats to kill his ex-wife, drew its essence from the parties' CBA, is inapplicable here.

We next address Welby's contention that his statements that he would like to punch and choke Nurse Supervisor cannot be considered a *true threat* under the totality of the circumstances test applied in J.S. In J.S., our Supreme Court,

20

borrowing from the Wisconsin Supreme Court's decision in In re A.S., 626 N.W.2d 712 (Wisc. 2001), employed an objective reasonable person standard in determining whether a middle school student's internet threats to among other things, kill his teacher, constituted protected speech under the First Amendment or constituted a true threat to inflict harm. J.S. defined a *true threat* as a statement that a speaker would reasonably foresee that a listener would reasonably interpret as a serious expression to inflict harm, as opposed to hyperbole, jest, or innocuous talk. In making this determination, the totality of the circumstances must be considered. Interestingly, in J.S., our Supreme Court observed, it was not necessary that the speaker have the ability to carry out the threat.

Here, as noted above, DOC's Workplace Violence Policy has a zero tolerance for threats of violence, regardless of extenuating circumstances. Moreover, Investigator, who received Welby's threats and immediately reported them to Deputy Superintendent, found Welby's statements, made in anger, to be serious enough to constitute violations of the Workplace Violence Policy.[10] Therefore, we reject Welby's contention that his statements cannot be considered as *true threats* and therefore cannot constitute violations of DOC's Workplace Violence Policy.

---

[10] Welby also contends Appointing Authority did not present an expert medical or psychological opinion that he was likely to harm Nurse Supervisor. See Pet'r.'s Br. at 38. However, Welby cites no authority, and we are unaware of any authority, for such a requirement. Nonetheless, Investigator, who received Welby's call, testified his duties at the time included investigations of inmate and employee misconduct, and threat monitoring. N.T. at 68; R.R. at 68a. Welby's threats "concerned him" enough to immediately report it to Deputy Superintendent. N.T. at 73; R.R. at 73a.

21

## IV. Conclusion

For the above reasons, we discern no error or abuse of discretion in the Commission's determination that Appointing Authority removed Welby from employment for just cause in accord with Section 807 of the Civil Service Act, 71 P.S. §741.807.  Accordingly, we affirm.

ROBERT SIMPSON, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Raymond Welby,                             :
                          Petitioner       :
                                           :
              v.                           :    No. 1702 C.D. 2014
                                           :
State Civil Service Commission             :
(PA DOC - SCI Frackville),                 :
                          Respondent       :

## O R D E R

**AND NOW**, this 27th day of August, 2015, for the reasons stated in the foregoing opinion, the order of the State Civil Service Commission is **AFFIRMED**.

_____
ROBERT SIMPSON, Judge